In the matter of the JURY COMMISSIONER OF PASSAIC COUNTY.

[Decided June 23d, 1928.]

*Mr. James J. Murner,* for the commissioner.

WALKER, CHANCELLOR.

On or about Thursday, May 17th, 1928, Mr. Justice Black, of the supreme court, holding the Passaic circuit, presented to me affidavits of Peter Hickerson, Thomas J. Reardon and Dorothy Vitell, from which it appeared that Samuel Geldziler, the jury commissioner of Passaic county, appointed by the chancellor under the act of 1913, had been guilty of using his office for political purposes, and asked that the jury commissioner be removed, under section 3 of the act referred to. *P. L. 1913 p. 828.* An investigation had then recently been made by the prosecutor's office of Passaic county, and the affidavits taken were sent by the assistant prosecutor to Mr. Justice Black. Section 3 is as follows:

"The chancellor of this state may, at any time, remove the appointed commissioner in any county, and in case of a vacancy occurring by such removal, or by death, resignation, removal from the county, or

because of disqualification by the assuming of duties of any other public office, or for any other reason, shall appoint his successor for the balance of the term. The certificate of removal and of appointment to fill the vacancy shall be filed in the office of the clerk of such county."

Thus it appears that the chancellor making the appointment has an absolute discretion to remove the appointed commissioner at any time without hearing. This is unlike the case of an official where the statute requires a notice and hearing before removal. *McCran v. Gaul, 96 N. J. Law 165.* The position in question is a public office. *Brodman v. Rade, 2 N. J. Mis. R. 364, 366.* However, although an appointed jury commissioner accepts his appointment subject to power in the chancellor to make a summary removal of him, nevertheless, in deference to the general principle of law, which is, that no man shall be condemned unheard, I concluded to give Mr. Geldziler, the commissioner, a hearing. In consequence, on May 18th, 1928, I wrote him enclosing copies of the three affidavits that had been presented to me, informing him how they were handed to me, stating that they showed that he had been guilty of political activity in reference to the office of jury commissioner, which, of course, should be entirely divorced from politics, and stating that I would give him an opportunity to make defense if he so desired. To this communication I received from Mr. Geldziler, under date of May 21st, 1928, a letter saying that he desired to deny the charges, and requested me to grant him an oral hearing, and on May 26th he enclosed to me seven affidavits. The oral hearing mentioned has also been had.

It now becomes pertinent to inquire what is the substance of the affidavits of the persons complaining of the conduct of the commissioner.

Peter Hickerson swore that he resides in Paterson and is a registered voter there; that on or about May 7th, 1928, he received a letter from the jury commissioner of Passaic stating that deponent was eligible for jury duty, and that if he desired to serve to communicate with Mr. Geldziler; that he called on Mr. Geldziler at the Passaic county court house, where the following conversation took place:

"I told Mr. Geldziler who I was and showed him the notice and told him that it would be both inconvenient for me and for the firm for which I worked to serve as a juror. Mr. Geldziler then replied: 'If you do me a favor, I will do you a favor.' I said: 'What is it?' He said: 'Give Jimmie Murner a vote.' I said: 'I will.' Then he said: 'This is on my honor and I want you to be on your honor,' then we shook hands on it."

Thomas J. Reardon also swore that he was a legal voter in Paterson; that he received a letter from Mr. Geldziler, on or about May 7th, 1928, of the same tenor and effect as that received by Mr. Hickerson; that on May 9th, 1928, he went to the office of Mr. Geldziler, jury commissioner, in the court house, Paterson, and that the following conversation took place:

"I walked in and he said: 'Hello, how are you Tom?' I said: 'Alright.' I said: 'I have some notices here in my pocket,' and I drew the three notices out. I said: 'My three sisters-in-law received notice and they are not residents of the state just at present. They came back and are thinking of buying a house.' 'They asked me to come and ask you about those notices to be excused from jury duty.' I said: 'I also have one for my wife.' I said: 'She will not be able to do jury duty.' He said: 'That is alright. Mr. Reardon, we will take care of that.' He said to the clerk: 'Mark them excused.' He said: 'How about yourself or your boy?' I said: 'I am not particular, I will serve and I think my boy will. I will serve anytime I am drawn and I think the boy will do likewise.' So he said: 'Now, Mr. Reardon, I want to ask you, I have got a very dear friend running for office and I would like you to give him a vote to help him.' I replied that I knew his dear friend but would not vote for him as Mr. Kelly was my choice. Then he said: 'Well, how far is Kelly going to beat Murner?' and I said that I couldn't say. He said: 'All the machine is behind him.' I said: 'I don't know about that but I know I am with him and I think all respectable democracy is with him.'"

Dorothy Vitell swore that she received a communication from Mr. Geldziler of the same tenor and effect as those received by Messrs. Hickerson and Reardon; that she called at the office of Mr. Geldziler in the court house in Paterson with her sister, and the following there took place:

"I said to him that I had come in answer to the letter and showed him the letter I had received. He then said to me: 'Do you desire to serve on the jury?' I said: 'Yes.' He said to my sister: 'Did

you receive a letter?' She said: 'No.' He said: 'Would you like to serve?' She said: 'Yes.' He said: 'Will you give Jimmie Murner a vote?' She said: 'Yes.' He said to me: 'Will you?' I said: 'Yes.' Then he said: 'I will see that you serve on the jury.' "

It is observable from these communications that, if true, they show activity on the part of Mr. Geldziler, the appointed commissioner, to use his office with reference to furthering political interests. He was offered an opportunity to defend himself, the offer not being limited in anywise. It was at his choice. He chose to submit affidavits, and when they came in, much to my surprise there was no affidavit from Mr. Geldziler himself. In other words, no point blank denial by him on oath of the charges that had been made against him.

I will now examine the affidavits submitted on behalf of the defense.

Thomas Carless, one of the affiants, is sheriff of Passaic county. He simply swore that the notices that were sent out from the office of the commissioners of juries were sent out with his knowledge and consent after a conference held with Judge Porter of the Passaic county court; that they were sent out for the purpose of giving the commissioners of juries an opportunity to make a personal observation of those eligible for jury duty and to determine the number of those who were willing to serve and those who did not desire to serve; that he had sent out similar notices and had interviewed several persons eligible for such duty. This goes to the question of the notices alone.

An affidavit of Peter Murner is submitted. He swore that he is a member of the police department of Paterson; that on May 12th, 1928, he had pointed out to him by a citizen two young men that he had seen breaking into a store, and that he, deponent, apprehended them, one of whom was William J. Reardon, son of Thomas J. Reardon, who had made an affidavit with reference to the activity of Commissioner Geldziler; that he had preferred a charge of burglary against young Reardon prior to the taking of the affidavit of his father, which he had read. The object of this affidavit, of course, is to show animus upon the part of Thomas J. Reardon in the making of his affidavit. It does not dispute the

truth thereof, except inferentially, so far as interest may be thought to discredit him.

An affidavit of Sarah E. Little is submitted. She swore that she is employed in the office of the commissioners of juries of Passaic; that she was present in that office at all times when it was open, and was present when Commissioner Geldziler interviewed those responding to notices sent out, and was in a position to hear the conversations, and at no time did she ever hear Commissioner Geldziler make any promises to anyone regarding service on the jury; that she had read the affidavits of Dorothy Vitell, Thomas J. Reardon and Peter Hickerson, and knew the statements concerning Commissioner Geldziler's activity to be in fact untrue.

May Scowcroft also made affidavit and swore that she was a clerk in the office of the commissioners, and corroborated the statements made by Miss Little.

Natalie Schlenger also made an affidavit and swore that she was employed as a clerk in the office of the commissioners of juries, and corroborated the testimony given by the Misses Little and Scowcroft; and further deposed that under the direction of Commissioner Geldziler she mailed out several notices, of which the following is a true copy:

"Jury Commissioners:
THOMAS CARLESS, Sheriff
and
SAMUEL GELDZILER.

In examining the lists for jury service, I find listed thereon your name, and I am writing to ask you to get in touch with me and let me know whether or not you are desirous of serving on the jury.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
*Commissioner*
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
*Commissioner*."

The only important thing about these three affidavits of the women is that they were in attendance in the office (which was fairly small) at all times when Commissioner Geldziler was there, and said that he did not make any promises with reference to jury duty in return for a vote for anyone, or words to that effect. Now, this is what is known

in law as negative testimony. It is that the witness did not hear anyone make certain remarks. It is like the conflicting testimony that is submitted to courts every term, notably in railroad accident cases, where one class of witnesses say that a bell rang or a whistle was sounded, and another class say that they heard no sound at all given, and that they were in a position to hear. It is a question of fact for the jury to determine whether in all the circumstances the signals were given, and so I, sitting here in this matter, am a trier of the facts, and must determine whether or not, in all the circumstances, the statements contained in the affidavits of Hickerson, Reardon and Vitell are true. And I conclude they are in substance correct. It is a notorious fact that one can sit in his library with a loudly striking clock in the room, and if mentally alert and not pursuing any subject, may hear the sound; but if interested in reading or something else, the clock may strike hours, half hours and quarters without being heard at all. And it is equally notorious that railroad trains, which made considerable noise ordinarily in a given house, will be entirely unheard there during hours of mental concentration. So this negative testimony does not impress me greatly, if I assume, which I think I must, that these women clerks were busily engaged in their duties when those in the office were talking to Mr. Geldziler; and, besides, they doubtless are desirous, so far as possible, of aiding Mr. Geldziler in this matter. But this is not all. The fact that Mr. Geldziler does not himself make an affidavit, and, on oath, does not deny in terms each and every accusation made by these affidavits against him, is persuasive to my mind that those statements are substantially true. No judge could justify himself in deciding otherwise.

William Norval made an affidavit in which he swore that he was county physician of Passaic, with an office in the court house, which was shared by the commissioners of juries; that he was present on several occasions when Commissioner Geldziler interviewed persons responding to notices sent out, and on no occasion did he hear him make any promises or solicit any votes. Of course, there may have been many occasions when Mr. Geldziler had an opportunity to do what Dr. Nor-

val says he never heard. His testimony is purely negative and is of value in deciding the merits of this case.

Elizabeth Hughes Higham says that she was a candidate for election to membership on the Democratic state committee at the primary election held May 15th last; that on the 19th of April, 1928, she was called on the telephone by Assistant Prosecutor James N. Dunn, who stated that he heard that she was supporting the candidacy of James J. Murner for membership on the Democratic state committee, and he stated to her that "we have a petition with a sufficient number of signers" which they would file against her if she was in favor of Mr. Murner's candidacy; that she was familiar with Mr. Dunn's voice and knows that he was the person talking to her; that on the night of the primary election she was at a certain polling place (naming it), and that during the count Assistant Prosecutor Dunn, who is not a resident or voter in that district, came in and watched the count. This goes to show political activity against Murner and Miss Higham herself, but does not really touch the merits of the question in controversy. These are all of the affidavits submitted on both sides.

The object of the Jury Commissioner act above cited was, of course, to remove the juries from political control, and it was intended thereby that the appointed jury commissioner, while being required to be a member of a political party opposite to that of the sheriff, and, of course, properly so, should engage in the selection of high-class citizens for jury duty, but that he was not to use his office as such for any political purpose. The sheriff, likewise, should not indulge in the selection of juries with any purpose of political control in mind; but as to sheriffs I have no jurisdiction whatever, none is accused here, and as to them as a class I have nothing to say. Doubtless the absolute discretion confided to the chancellor to remove jury commissioners appointed by him was given by the act of 1913 for the purpose of enabling him at all times to have control over those he selected, and to remove them if occasion should, in his judgment, so require. In two or three instances I have heard of conduct unbecoming the office of jury commissioner by sundry incumbents and have

not reappointed them when their terms expired. In this instance, however, the jury commissioner has been expressly charged with a violation of duty, and I am asked by the supreme court justice, holding the Passaic circuit, to remove him. This is an accusation which I am not at liberty to disregard, and in investigation of the matter, as the jury commissioner occupies a *quasi*-judicial position, I laid down for myself rules of law governing a judge in deciding the facts of a given case. In applying those rules I feel compelled to conclude that the commissioner has been guilty of the conduct attributed to him.

The commissioner accepted the offer of an oral hearing, and he came to Trenton with his counsel and with the three young women clerks in the jury commissioners' office in Paterson. Where there is authority to appoint those clerks I do not know and decide nothing, as the matter is not before me, nor have I jurisdiction. There is, however, in the law, provision for the appointment of *a* clerk.

Counsel for the commissioner offered to swear the young women and permit me to cross-examine them. I decline, as I had no questions I desired to ask them; they had made their statements in affidavits which were submitted. And in his argument counsel did say that Mr. Geldziler denied all of the accusations that were made against him. Of course, he could say that *arguendo;* but he had no affidavit of Mr. Geldziler denying the facts specifically charged. I had hoped and expected that in justice to the commissioner some statement would be made excusing the absence of an exculpatory affidavit from him, but none was forthcoming. I can only marvel at his silence, and must conclude from that alone that the facts stated in the affidavits of Hickerson, Reardon and Vitell are true. This leads to the inevitable conclusion that the commissioner has used his office for political purposes, and I am therefore constrained to the conclusion that he should be removed, and such will be the order.

Before leaving the subject I think I ought to say that there is nothing objectionable in the form of the letters sent out by the jury commissioners of Passaic county. A similar letter, I understand, is sent out by the commissioners of the adjoin-

ing county of Bergen, and I know that in Mercer county, at least some years ago, a letter somewhat similar in form was sent out. There can be no impropriety in jury commissioners inquiring of residents if they are eligible for jury duty, and whether or not they desire to serve. Such ascertainment beforehand will often save the court considerable time in considering applications to be excused, and the trial court, when drawing a jury, on the question of challenges, &c. Another thing: There seems to be a fierce fight in Passaic county between opposing factions of the Democratic party which has assumed a stage of bitterness not creditable to the participants. But as to that I have nothing to do, nor has it anything to do with the facts of the case in hand. And, let me say, that what Mr. Geldziler did with reference to soliciting votes at the primary for a candidate in whom he was interested, is, of course, unobjectionable. The objection comes in when, as here, he solicited them to so vote in connection with a promise either to place them upon, or excuse them from, the jury lists. It seems to me remarkable that Mr. Geldziler in his zeal for his candidate would permit himself to forget what was required of him by the office which he held. His personal character generally is not assailed.

Although this is a proceeding before the chancellor as a statutory agent, nevertheless, by *P. L. 1915 p. 28*, all such proceedings shall be entitled in the court of chancery and filed there, to the end that the clerk may make certified copies of all such proceedings when requested, and that such copies when certified shall have the same force and effect as certified procedings in cases in the court. *State* v. *Giberson, 94 N. J. Eq. 25, 26.*

Order accordingly.